Downey, Judge,
delivered the opinion of the court:
This case involves the period from October 1, 1868, to June 30, 1870, and takes us back to the stage-coach days of half a century ago when a large part of our now prosperous western country had not yet been penetrated by the railroads. A program of legislative relief began in January of 1870 and continued with more or less but no ultimate success until in 1902, when Congress shifted the burden to this court by inserting in the act of May 27,1902, 32 Stat. 207, the following provision:
“ That the legal representatives of Chauncey M. Lockwood . be, and they are hereby, authorized to commence their suit in the Court of Claims of the United States for extra mail service on route numbered sixteen thousand six hundred and thirty-seven, extending from Salt Lake City, Utah, to The Dalles, Oregon; and the Court of Claims shall have jurisdiction to- adjudicate the same upon the basis of justice and equity, and to render a final judgment therein for the value of such extra mail service performed as aforesaid; and from any judgment that may be rendered in said cause either party thereto may appeal to the Supreme Court of the United States; and the bar of the statute of limitations shall not avail in such cases.”
On August 24, 1868, Chauncey M. Lockwood, the father of this plaintiff, entered into a contract for carrying of the mails on route No. 16637 from Salt Lake City, Utah, to The Dalles, in Oregon, a distance of about 875 miles, predicated upon his bid therefor made in response to an advertisement of March 9, 1868, and accepted June 13, 1868. The contract is set out in full in the findings.
At the time of the making of the bid the practical operation. of the laws then in force (act of March 25, 1864, 13 Stat. 36, amended by act of January 20, 1865, 13 Stat. 421) was, by the application of letter postage, to exclude from the mails carried over the route in question all mailable matter except letters, newspapers from a known office of publication to bona fide subscribers, and franked matter, and by the amendatory act, “ newspapers, periodicals, magazines, and exchanges from a known office of publication, to bona fide subscribers, not exceeding one copy to each subscriber from any one office.”
*259 On June 25,1864, after the submission of the bid by Lockwood but before the execution of the contract and more than three months before his service was to commence, Congress passed a repealing act (15 Stat. 79) the effect of which, it is claimed, was to largely increase the amount of mail to be carried on this route, and the action is to recover $100,000 as the resultant increased cost.
On November 11,1875, while the matter was also pending in Congress, Levi H. Lockwood, administrator, and Levina J. Lockwood, administratrix, commenced an action in this court to recover for these alleged additional services and expenses the sum of $227,237.96. On December 1, 1879, the day upon which the case had theretofore been set for trial, the case was, by the plaintiffs, dismissed. On April 28,1904, this action was commenced. On May 4, 1914, it was dismissed by the court for want of prosecution. On June 27, 1914, there was filed an application to set aside the dismissal, alleging misunderstanding or inadvertence and a purpose to proceed with the preparation of the case and the action was reinstated.
This motion to set aside the dismissal‘and reinstate the action was entitled, “ Levi H. Lockwood, Admr., and Levina J. Lockwood, Admx., v. The United States,” and was signed by the “Attorney for Claimants.” It is now contended by the defendant that no motion was ever made to reinstate this case and that it stands dismissed by virtue of the order of May 4, 1914, and is not before the court for consideration. But the motion to set aside the dismissal and reinstate the case also bore the correct number of this case; the entitling was regarded as and no doubt was an inadvertence; the order to reinstate was intended by the court to apply to this case, and it has been and will be so regarded.
But another question is presented by the defendant which is properly for consideration before we reach the merits of the case on the facts. It is contended that this action can not be maintained by the present plaintiff as heir but should and must have been brought by the administrator de bonis non.
The jurisdictional act, without which of course the present action could not have been maintained at all, authorized the *260 commencement of suit by “ the legal representatives of Chauncey M. Lockwood.”
While it is not difficult to sustain by authority the contention that “ legal representative ” means, in case of an intestate decedent, his administrator, it is, on the other hand, not difficult to sustain the contention that heirs are sometimes to be held to be within that term. But if the latter contention is to be conceded in the aspect of the many cases on the subject, it would seem that the facts of the present case exclude it from that class. It appears by certifie'd copy of his letters, set out in Finding XI, that in December, 1887, one J. W. Hodson, then said to be the guardian of this plaintiff, was duly appointed “ administrator of the estate of said Chauncey M. Lockwood, deceased, de bonis non.'' There is no attempt made to show, as no doubt might easily have been done if it were a fact, that Hodson’s fiduciary capacity had been in any way terminated before this suit was brought, and it appears that he was in life until some time in 1914. And it is significant as to this appointment and the continuance of the trust and also as to the intention of pending legislation, framed in that respect like the jurisdictional act, that: a certified copy of this appointment accompanied a bill introduced in the Fifty-seventh Congress, the same Congress which passed the act conferring jurisdiction, which bill provided for payment for alleged extra mail service to “the legal representatives of Chauncey M. Lockwood, deceased.” It does not appear in the record and we have not thought it worth while to search congressional procedure for the facts, but common knowledge of such matters justifies the assumption, at least as a probability, that the paragraph in the act of May 27, 1902, conferring jurisdiction on this court, was the determined-upon disposition of the bill referred to in connection with which the certified copy of this appointment was presented.
Entirely aside from what it might be concluded that Congress, under these circumstances, meant when it authorized Lockwood’s “ legal representatives ” to commence suit in this court, we find no authority justifying the conclusion that “legal representatives” may be construed to include heirs when there is an administration pending and an acting ad *261 ministrator. After an estate has been administered upon and the administrator discharged, heirs may well be held to be, for some purposes, the legal representatives of the decedent and may be so recognized without conflict of authority or confusion in procedure, but to vest authority to institute proceedings in behalf of an estate in the administrator or the heirs or both at the same time would present a condition which repudiates itself. There seems no room for any conclusion other than that while an administration is pending and an administrator is acting or empowered to act, he, to the exclusion of the heirs, must act in the prosecution of claims due the estate. We may add to this what it is apparent that Congress, under the circumstances stated, must have intended by these words when it authorized institution of this suit. i
A conclusion that this plaintiff had no right to institute and maintain this action necessarily disposes of it, but such disposition is upon a ground somewhat technical in its character and we prefer not to base our disposition of the case entirely upon it. There is also another theory of the defense presented, which if sustained, would result in a disposition of the case without regard to its merits on the facts. That is the contention that by reason of the operation of the Crawford amendment the case should be dismissed. We do not find it necessary under the circumstances to decide this question.
This matter has been pending in one form or another, in one jurisdiction or another, for 60 years. Congress had had to do with it for over 30 years when it cleared its own decks by opening the doors of this court to the claimant upon its prescribed terms. Under all the circumstances we think it but proper that we should, in addition to what has been said, indicate our views as to the merits of the case.
It is noticeable that the jurisdictional act authorizes us to adjudicate this claim “ upon the basis of justice and equity ” and to render judgment for “ the value of such extra mail service performed as aforesaid.” The act seems to concede that there could be no recovery in an action at law on the contract and such is so evidently the case that that view of the matter need not be discussed. Just what the actual scope *262 of tbe jurisdiction conferred is, may be somewhat problematic, but our view of the case renders accurate definition unnecessary.
The action is upon the theory that Lockwood performed additional service and incurred additional expense by reason of the increase in the weight of the mails resulting from the change in the law referred to above for the contract period from October 1,1868, to June 30, 1870, inclusive, and it may be observed, as shown by the findings, that the various claims presented to Congress were upon the theory that he had performed this largely augmented service during this whole period. This is plainly not the fact. It appears from the record, undisputed, that Lockwood never carried the mails over all of this route. He carried them over a portion of the route for the first four months, during which time they were carried over the remaining portions of the route by subcontractors ; and it appears undisputed that after the expiration of that four months he had nothing whatever to do with carrying the mails over any part of the route. He sold the route to another man, who took it over in its entirety on February 1, 1869, so that it is apparent that if there is merit in the claim at all it must be found in the first four months of the contract period.
The payments for the service after the sale of the route were, according to the testimony, never made through Lockwood. The purchaser, Haley, testifies that they were made to him through his bank at Portland, Oreg., the bank at the end of each quarter receiving from him the necessary certificates as to his rendition of the service together with his “ check on the Post Office Department ” and attending to the collection for him, placing the amount to his credit. We have been asked and have declined to make a call on the Post Office Department intended to procure vouchers or checks issued in payment for the service on this route, or information with reference thereto, for the purpose of disputing the testimony of Haley as to payments being made direct to him, if in fact that should be the result of such production, a fact not alleged. Haley was plaintiff’s witness. But if plaintiff might be conceded the right to dispute his own witness it could serve no purpose favorable to him if it should be made *263 to appear that vouchers for the service on this route after the first four months were issued in Lockwood’s name. It is undisputed and it is not proposed to dispute the fact that the pay went wholly to Haley without Lockwood’s intervention. If we should assume that in eonnéction with the sale of the route and the execution of the written contract with reference thereto, there had also, as providing a method of procedure, been executed a power of attorney by Lockwood to Haley or to Haley’s bank authorizing the execution of vouchers and if in fact vouchers had thereafter been issued in Lockwood’s name, but handled as indicated, the proceeds going wholly to Haley without Lockwood’s intervention, it could serve no good purpose in the plaintiff’s behalf. That such was the possible procedure is only an assumption, unimportant if perchance correct. It is conclusively shown that Lockwood was entirely free from any burden or responsibilities of any kind growing out of this contract or of any participation in it in any way after the first four months. We come to consideration of that period.
When the facts such as we have before us with reference to this contract are summarized they present some peculiarities. We find no protest made, after the change in the law, against entering into this contract, although the change in the law had occurred about two months before its execution, and after the execution of the contract we find no protest against entering into its performance, although the period of performance did not commence for more than a month thereafter. And this is true although much stress is laid on the fact that another bidder for another route passing through Salt Lake City declined to enter upon the performance of his contract. He had knowledge of the change in the law. The presumption is that Lockwood also had. And after entering upon the performance of the contract there was no protest made to the Post Office Department, no claim made for any additional compensation, no intimation that conditions were in any way unsatisfactory, but when Lockwood sought to sell the route to Haley he informed Haley that he was going to press a claim for additional pay, and in connection with the sale and as a part of the consideration passing to Haley agreed that he would give Haley one-half of *264 what he recovered. This agreement, its making undisputed, although not included in the written contract because not deemed “advisable,” might be for consideration as to its effect, if worth while in the light of other considerations. But even after announcement to Haley of this purpose there was no communication on the subject to the Post Office Department, was never any in fact with the department until after the expiration of the contract period, but a movement started in the Senate and it was only after a reference to the department for information that the head of the Postal Service knew anything about any such claim.
During this four-month period when Lockwood operated a part of the route himself and the other parts through subcontractors he paid nothing additional to any subcontractor by reason of any increase in the mail. That he went to any additional expense himself on account of any increase is not shown. He operated from the beginning with a makeshift equipment so insufficient that he necessarily had to make some additions, but not shown to be required by reason of increase in the amount of mail. Indeed it is not shown that by reason of the change in the law there was any appreciable increase in the mails on this route during this four-month period. Such increase as might be assumed from the figures deduced as stated in the findings in.no manner enables a separation of normal increase from any increase occasioned by the change in the law, and it is not shown that there was any such increase during that period from any cause as to impose any serious burdens. There were fluctuations, increases followed by decreasés, a condition not apt to result from operation of the law, the time was too short after the law went into effect to have produced as yet any very marked change, and we are without proof that there was in fact any such increase as claimed.
Our general knowledge of domestic affairs tells us that at the time here involved speculation in mail contracts was prevalent, and all the circumstances of this case point to the assumption that Lockwood was a speculative contractor. There is nothing in his procedure that indicates any purpose on his part to operate this route, but quite early in the contract period there were indications of a purpose to sell it *265 and finally of a specific purpose to sell it to Haley. This he did, receiving therefor $52,000. He had, of course, received the compensation called for by his contract for the four-month period; he received this $52,000 for the route and equipment, and in addition Haley paid him something over $15,000 for forage on hand along the route. The testimony shows that he received in this deal much more than the equipment and forage were worth, the difference, whatever it may have been, being to him a profit on the contract. The findings are to that effect.
If upon the proposition first discussed it is to be said that dismissal should have been ordered without further consideration on the merits, we must confess technical defect in procedure, but justify because of the peculiar jurisdiction conferred and the apparent desirability, under all the circumstances, that there should be expression on the merits of the case.
There are many facts set out in the findings with reference to compensation paid on this route both before and after the Lockwood contract and also upon another route in that locality to which we have not referred herein. They appear in the findings in response to plaintiff’s request.
We conclude that the plaintiff is not entitled to recover, that the petition should be dismissed, and it is so ordered. -
Graham, Judge; Hay, Judge; Booth, Judge; and Campbell, Chief Justice. concur.